CLEAN AIR IMPLEMENTATION
PROJECT, et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent,

Natural Resources Defense Council, Inc.
and Battery Council International,
Intervenors.

Nos. 97–1117, 97–1125, 97–1130, 97–1142, 97–
1169, 97–1173, 97–1179,97–1190, 97–1195,
97–1226, 97–1241, 97–1242, 97–1253,97–
1254, 97–1259, 97–1261, 97–1266, 97–1269,
97–1273,97–1278, 97–1281, 97–1282, 97–
1283, 97–1286 and 97–1289.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 21, 1998.

Decided Aug. 14, 1998

them on the briefs were Mel S. Schulze, Lauren E. Freeman, David E. Menotti, William F. Pedersen, Joshua D. Sarnoff, Gene E. Godley, Robert N. Steinwurtzel, Howard B. Myers, Roger Walker, Leslie Sue Ritts, Chris S. Leason, Robert Brager, David Friedland, Christina Franz, Alexandra Dapolito Dunn, Julie Hatcher, Michael H. Levin, Michael McGovern, Lynn L. Bergeson, Bethami Auerbach, Robert L. Brubaker, Janet J. Henry, Paul G. Wallach, Kenneth R. Meade, Jerome H. Heckman, Peter L. de la Cruz, William M. Bumpers, Debra J. Jezouit, Jennifer S. Leete, John L. Wittenborn, Chet M. Thompson, Edwin H. Seeger and Jane C. Luxton. David F. Zoll and Richard A. Flye entered appearances.

Karen L. Egbert and Patricia Ross McCubbin, Attorneys, U.S. Department of Justice, argued the cause for respondent. With them on the brief were Lois J. Schiffer, Assistant Attorney General, Robert G. Dreher and Gregory B. Foote, Counsel, U.S. Environmental Protection Agency. Cecilia E. Kim, Attorney, U.S. Department of Justice, entered an appearance.

William H. Lewis, Jr., Joshua D. Sarnoff and David B. Weinberg were on the brief for intervenor Battery Council International.

Gail Lewkowicz was on the brief for amici curiae State and Territorial Air Pollution Program Administrators (STAPPA) and Association of Local Air Pollution Control Officials (ALAPCO).

Before: SILBERMAN, WILLIAMS, and RANDOLPH, Circuit Judges.

RANDOLPH, Circuit Judge:

Petitioners Clean Air Implementation Project and other trade associations[1] brought this action for judicial review of the Environmental Protection Agency's rule permitting the use of "credible evidence" to prove or disprove violations of the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.* They allege that the rule is illegal for various reasons, including lack of statutory authority and unlawful revision of substantive standards. We hold that

Henry V. Nickel and William H. Lewis, Jr., argued the cause for petitioners. With

1. The trade associations represent various industry groups, including car manufacturers, lumber companies, steel producers, petroleum companies, and mining companies.

the issues they raise are unripe and cannot be decided at this time.

## I

The Clean Air Act directs the EPA Administrator to develop and promulgate three types of air pollution standards. National ambient air quality standards ("NAAQS"), issued under § 109, 42 U.S.C. § 7409, specify the maximum permissible concentrations of six criteria pollutants in the air. *See* 40 C.F.R. pt. 50. The Act makes states primarily responsible for the attainment and maintenance of the NAAQS through state-designed implementation plans, *see* 42 U.S.C. § 7410, also called "SIPs," which EPA must approve and which become federally enforceable once approved, *see id.* § 7413(a). Performance standards issued pursuant to § 111, 42 U.S.C. § 7411, regulate emissions of air pollutants from newly constructed or modified stationary sources. *See* 40 C.F.R. pt. 60. Emission standards for stationary sources of hazardous air pollutants for which no ambient air quality standard is applicable are issued pursuant to § 112, 42 U.S.C. § 7412.[2] *See* 40 C.F.R. pt. 61. EPA may enforce these standards through administrative, civil, or, with the assistance of the Attorney General, criminal actions. *See* 42 U.S.C. § 7413.

Before EPA adopted its credible evidence rule in February 1997, 62 Fed.Reg. 8314, the agency's air pollution standards specified not only the maximum permissible level of emissions, but also the performance or reference test that should be used as a means of sampling and analyzing air pollutants for the particular standard. *See, e.g.,* 40 C.F.R. §§ 60.2, 61.02. A reference test is any "generic multi-use test protocol[ ] that measure[s] whether a source's emissions comply with numeric performance standards." Paul D. Hoburg, *Use of "Credible Evidence" to Prove Clean Air Act Violations,* 25 B.C. ENVTL. AFF. L. REV. 771, 784–85 (1998). Subparts of Title 40 prescribe reference tests for various emission sources. Appendix A to 40

C.F.R. Part 60, for instance, contains more than fifty different test methods for determining compliance with the new source performance standards. *See also* 40 C.F.R. pt. 61, App. B (listing test methods for hazardous air pollutant standards); 40 C.F.R. pt. 51, App. M (listing recommended test methods for state implementation plans). In all, there are approximately 130 reference tests, although the same test may be "used in connection with many different performance standards." Hoburg, *supra,* at 785.

In the rulemaking challenged here, EPA added nearly identical language to five sections of its regulations, providing that nothing in them "shall preclude the use, including the exclusive use, of any credible evidence information, relevant to whether a source would have been in compliance with applicable requirements if the appropriate performance or compliance test or procedure had been performed." 40 C.F.R. § 60.11(g); *see also* 40 C.F.R. §§ 51.212(c), 52.12(c), 52.33(a), and 61.12(e). The agency based these revisions on its "long-standing authority under the Act, and on amplified authority provided by the 1990 [Clean Air Act Amendments]," specifically § 113(a) and (e), 42 U.S.C. § 7413(a), (e). 62 Fed.Reg. 8314. Section 113 deals with federal enforcement of emission standards and, according to its legislative history, was amended to enhance EPA's enforcement powers. *See* S. REP. No. 101–228, at 358 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3741. EPA maintains that the "language, history and intent" of the 1990 Amendments support its credible evidence revisions. 62 Fed.Reg. 8314.

Nothing in the rule itself defines or limits the possible kinds of evidence encompassed within the phrase "credible evidence." EPA explained in the preamble to its final rule: "today's rule will make it clear that various kinds of information other than reference test data, much of which is already available and utilized for other purposes, may be used to determine compliance or noncompliance with emission standards." 62 Fed.Reg. at

---

**2.** In the Clean Air Act Amendments of 1990, Congress rewrote § 112 to include a list of 189 toxic air pollutants that EPA was required to regulate. However, § 112(q) provides that standards in effect before the date of enactment "shall remain in force and effect after such date."

8315. The preamble listed "engineering calculations, indirect estimates of emissions, and direct measurement of emissions by a variety of means" as methods on which EPA, state agencies, and industry routinely rely. *Id.* Also mentioned were "continuous emission monitoring" and "parametric monitoring" data. *Id.* To illustrate, EPA discussed the use of a continuous opacity monitor instead of Method 9, the reference test method for opacity. Method 9 requires that a "trained visible emissions observer (VEO) view a smoke plume with the sun at a certain angle to the plume in order to properly illuminate it. In contrast, a continuous opacity monitor (COM) contains a calibrated light source that provides for accurate and precise measurement of opacity at all times. Notably, EPA uses COM data to certify and re-certify the credentials of VEOs under Method 9." *Id.* at 8319. Thus, according to the agency, continuous opacity monitoring data would be credible evidence in lieu of Method 9. The preamble also cited two citizen suits based on credible evidence. *Id.* at 8318. In *Sierra Club v. Public Service Co.,* 894 F.Supp. 1455 (D.Colo.1995), the court accepted opacity monitoring data and reports as means of proving emissions violations. In *Unitek Environmental Servs. v. Hawaiian Cement,* No. 95–00723, 1996 WL 808154 (D.Haw.1996), the court upheld the use of evidence that included EPA's notice of violation issued to Hawaiian Cement several months before, Hawaiian Cement's admission of noncompliance, and results of Hawaiian Cement's computerized modeling of its own particulate emissions.

Petitioners argue that EPA promulgated the rule without statutory authority, that the revisions are unlawful because EPA failed to comply with proper rulemaking procedures, and that EPA violated the Clean Air Act by forcing states to rewrite their implementation plans. The heart of the argument is that the credible evidence rule, by altering the means of determining compliance for the new source performance standards and the hazardous air pollutant standards, increases the stringency of the underlying standards. Since EPA admittedly did not conduct a rulemaking for each of the standards to which the credible evidence rule may be applied, petitioners charge that it violated the proce-dures required by the Act. *See* 42 U.S.C. § 7607(d). EPA's short answer is that there was no need for such proceedings because the standards have not been changed.

## II

Petitioners' theory of the relationship between tests and standards is this: the test method is an integral part of the standard itself and the test method should not be changed without a full evaluation of the impact such a change might have on the standard. The theory proceeds from the fact that in developing its standards, EPA relied on tests showing the standards to be consistently achievable using the best current technology. *See* Brief of Petitioners at 9–10. EPA then used these same test methods to determine compliance with the numerical standards it promulgated. Citing *Portland Cement Ass'n v. Ruckelshaus,* 486 F.2d 375 (D.C.Cir.1973), petitioners argue that changing the means of testing compliance amounts to changing the standard themselves. In *Portland Cement,* the court stated that "a significant difference between techniques used by the agency in arriving at standards, and requirements presently prescribed for determining compliance with standards, raises questions about the validity of the standard." *Id.* at 396. There the court required EPA to explain the discrepancy between the method used to develop the standard and the method used to enforce it. *Id.* at 397.

Petitioners' view of the interaction between tests and standards leads them to two contentions. First, they assert that any change in compliance method or test is substantive because "use of a different test method or procedure can lead to fundamental differences in results, due to differences in analytical method, data reduction, or measurement location." Brief of Petitioners at 13–14. For example, a newer and more sensitive test might detect emissions in excess of the numerical limit at times when the original reference test would show that emissions were below the regulatory ceiling. Second, they claim that the credible evidence rule converts "periodic" standards to "continuous" ones. *See id.* at 35–42. That is, sources previously subject to standards based on

"snapshot" data from infrequent "short-term" tests may now have their compliance monitored on an ongoing basis through the use of credible evidence. *Id.* at 35–36. Converting a periodic standard into a continuous one makes the standard more rigorous because, petitioners assert, continuous monitoring will capture all the fluctuations and variability inherent in emissions and thus increase each source's number of "violations." (According to petitioners, variability in emissions had previously been compensated for· by means of infrequent testing.) The issues raised by these contentions are not, we hold, justiciable at this time.

In 1967, three Supreme Court cases, decided in tandem, revolutionized judicial review of agency rulemaking. The cases—*Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681; *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697; and *Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704—dealt with the then-unsettled question when, if ever, courts may pass upon the validity of an agency regulation prior to its enforcement. "Before *Abbott Laboratories* the courts typically reviewed the lawfulness of an agency's rule, not when it was promulgated, but when it was enforced. After *Abbott Laboratories* reviewing practice changed radically." STEPHEN G. BREYER & RICHARD B. STEWART, ADMINISTRATIVE LAW AND REGULATORY POLICY 1136 (2d ed.1985). In deciding whether judicial review must await application of the rule in the concrete setting of an enforcement action, the Supreme Court adopted Judge Friendly's formulation in *Toilet Goods Ass'n v. Gardner,* 360 F.2d 677, 684 (2d Cir.1966) (quoting *Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 156, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring): there must be an evaluation of "both the fitness of the issues for judicial decision and the hardship to the parties of withhold-

ing court consideration.") ·*Abbott Labs.,* 387 U.S.. at 149, 87 S.Ct. 1507.

▪ In the three decades since *Abbott Laboratories,* "preenforcement review of agency rules and regulations has become the norm, not the exception," BREYER & STEWART, *supra,* at 1137, a trend accelerated by Congress' enactment of a host of regulatory statutes specifically providing for this. The review provision of the Clean Air Act, 42 U.S.C. § 7607(b), invoked here, is typical. It provides that a petition for judicial review must be filed within 60 days of publication of a rule in the Federal Register, 42 U.S.C. § 7607(b)(1), and that action of the EPA Administrator "with respect to which review could have been obtained ... shall not be subject to judicial review in civil or criminal proceedings for enforcement," 42 U.S.C. § 7607(b)(2). We have not considered this provision, or like provisions in other regulatory statutes, as requiring the court to adjudicate issues raised in a preenforcement challenge to a rule unless those issues are suitable for decision. If the issues are not of that nature, we will dismiss the petition as unripe. *See Louisiana Environmental Action Network v. Browner,* 87 F.3d 1379, 1385 (D.C.Cir.1996); *Association of American Railroads v. Surface Transportation Bd.,* No.97–1020, 1998 WL 343436, \*4 (D.C.Cir. June 30, 1998).[3] A necessary corollary is that if the issues later become justiciable, as a result for instance of an enforcement action, the petitioner may then raise those issues, notwithstanding the portion of § 7607(b)(2) just quoted. *See Louisiana Environmental Action Network,* 87 F.3d at 1381; *Baltimore Gas & Elec. Co. v. ICC,* 672 F.2d 146 (D.C.Cir.1982).

▪ As to petitioners' first contention, neither element of the *Abbott Laboratories* inquiry—fitness for judicial decision and hardship of denying relief—has been satisfied. In determining the fitness of an issue for judicial review we look to see whether the issue·"is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Natural Resources*

---

**3.** The purpose of withholding judicial review "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs.,* 387 U.S. at 148–49, 87 S.Ct. 1507.

*Defense Council, Inc. v. EPA,* 22 F.3d 1125, 1133 (D.C.Cir.1994) (quoting *Her Majesty the Queen ex rel. Ontario v. EPA,* 912 F.2d 1525, 1532 (D.C.Cir.1990)). EPA's credible evidence rule is final, but in contending that the rule alters the standards, petitioners have raised issues that are not purely legal, issues that are not suitable for decision in the abstract. *See Truckers United for Safety v. Federal Highway Administration,* 139 F.3d 934 (D.C.Cir.1998). Judicial resolution of these issues would benefit significantly from having "the scope of the controversy ... reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the [petitioners'] situation in a fashion that harms or threatens to harm" them. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 891, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

As matters now stand, there are too many imponderables. EPA insists that using credible evidence will not "change any of the numeric emission limits with which sources must comply" and that reference tests remain the benchmark against which credible evidence is measured. Brief of Respondent at 3, 11. In promulgating the rule, EPA stated that credible evidence was "not intended to and will not serve to affect the stringency of underlying emission standards by amending the nature of the compliance obligation." 62 Fed.Reg. at 8315. It explained:

> Typically, reference test methods ... quantify the presence of particular physical attributes—for example, mass or concentration of a chemical or group of chemicals—over a specified period of time. As long as these two elements, quantification and specified time period—are retained and the data from the alternate method is related to the reference test, information generated by alternate methods yield data bearing on what the results of a reference test would have been, and the use of such information to establish compliance or noncompliance in an enforcement action will not affect the stringency of the standard.

62 Fed.Reg. at 8319. Petitioners dismiss EPA's assertions, claiming that the agency "is in denial" about the consequences of its own actions. Brief of Petitioners at 34.

Will each of the 130 or so reference tests truly be maintained as benchmarks against which credible evidence will be measured? The tests themselves are described in "painstaking technical detail in various appendices throughout Title 40 C.F.R. chapter I." Hoburg, *supra,* at 785. For all we know, application of EPA's credible evidence rule in the place of a reference test may potentially affect some standards but not others. Moreover, credible evidence is not a closed set. Given the universe of all possible evidence that might be considered "credible," it is impossible for us to decide now what impact the rule will have. EPA's representation that credible evidence must be "related" to the results a reference test would have shown is highly abstruse. *See* 62 Fed.Reg. 8314 (promulgation of credible evidence rule). An enforcement action brought on the basis of credible evidence would, we believe, provide the factual development necessary to determine whether the new rule has affected whatever existing standard is involved. Until then, we have the "classic institutional reason to postpone review: we need to wait for a rule to be applied to see what its effect will be." *Louisiana Environmental Action Network,* 87 F.3d at 1385 (quoting *Diamond Shamrock v. Costle,* 580 F.2d 670, 674 (D.C.Cir.1978)).

Petitioners cannot point to any great hardship they would suffer by our deferring judicial review. EPA's rule does not require them "to engage in, or to refrain from, any conduct." *Texas v. United States,* —— U.S. ——, ——, 118 S.Ct. 1257, 1260, 140 L.Ed.2d 406 (1998). Unlike the drug manufacturers in *Abbott Laboratories,* but like the cosmetics companies in *Toilet Goods Ass'n v. Gardner,* 387 U.S. at 164, 87 S.Ct. 1520, petitioners here need not change their behavior or risk costly sanctions. Source owners and operators are already under an obligation to comply with EPA's emission standards. If the credible evidence rule has in fact altered these standards, petitioners can raise that as a defense in an enforcement action. The burden of participating in future proceedings does not "constitute sufficient hardship for the purposes of ripeness." *Florida Power &*

*Light Co. v. EPA,* 145 F.3d 1414, 1421 (D.C.Cir.1998). To be sure, it is easier and cheaper to mount a single challenge now rather than defend a series of enforcement actions. But "this kind of litigation cost-saving" does not "justify review in a case that would otherwise be unripe." *Ohio Forestry Ass'n v. Sierra Club,* —— U.S. ——, ——, 118 S.Ct. 1665, 1671, 140 L.Ed.2d 921 (1998).

■ This brings us to petitioners' contention that the credible evidence rule illegally converts "periodic" standards to "continuous" ones. Owners and operators of emission sources are required, according to petitioners, to meet emission limits only when intermittent tests are conducted; at all other times they are subject to no more than a "general duty" requirement to maintain good operating procedures. Brief of Petitioners at 18.

Again, we find that it would be premature for us to decide this issue now. EPA points to provisions of the Clean Air Act and implementing regulations seeming to support its view that compliance is required continuously, not periodically. Still, the effect of the credible evidence rule on compliance obligations is difficult to assess without any information or experience showing how the rule operates in particular settings. For some standards, measuring emission levels at each and every instant—*i.e.,* on a continuous basis—might affect stringency in ways that are impossible at this moment to foretell. We therefore find this issue unripe for review as well.

Because the merits of petitioners' first set of contentions are not justiciable, we do not reach their related assertion, also raised by Battery Council International as intervenor, that the Clean Air Act Amendments provide

no basis for promulgating the credible evidence rule. Petitioners argue that § 113(a) of the Act addresses only the initiation of an enforcement action.[4] Although this is a purely legal question, and thus presumably ripe, the need for statutory authority depends in the first instance on what it is that the credible evidence rule actually accomplishes. *See Toilet Goods,* 387 U.S. at 163–64, 87 S.Ct. 1520.[5]

### III

Petitioners also challenge EPA's credible evidence additions to 40 C.F.R. Part 51 (requirements for the preparation, adoption, and submission of state implementation plans) and Part 52 (requirements for the approval and promulgation of implementation plans), claiming that EPA has "violate[d] the Federal–State division of authority established by [§ 110 of the Act] by requiring States to revise SIPs that EPA has found are already adequate to implement the Act." Brief of Petitioners at 28. EPA's revisions inserted language to the effect that the state plans "must not preclude the use, including the exclusive use, of any credible evidence or information...." 40 C.F.R. § 51.212; *see also id.* §§ 52.12(c) (federal enforcement of state plans), 52.33(a) (compliance certifications). According to petitioners, these changes "illegally invade" the authority of states under the Clean Air Act. Brief of Petitioners at 48.

During the credible evidence rulemaking, the EPA responded to comments that these amendments were unauthorized by asserting that

> EPA is not by this rulemaking revising any SIP; rather, EPA is amending the rules governing SIPs. Such rules are promulgated under EPA's authority to (1) require SIPs to provide adequate enforce-

---

4. Section 113(a) provides that an action to enforce compliance may be brought "[w]henever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated or is in violation of" an applicable standard. Although § 113(a) is written in terms of *finding* a violation, the procedure followed is that the Administrator issues a notice of violation and then may either issue an administrative order, § 113(d), or commence a civil action, § 113(b). *See* 42 U.S.C. § 7413.

5. If, as EPA maintains, the rule really does not change the standards, then it might be seen as a permissible exercise of the agency's general rulemaking authority under § 301 of the Act, 42 U.S.C. § 7601(a)(1). (The agency itself does not rely exclusively on §§ 113(a) and (e), noting that the credible evidence rulemaking was "based primarily on EPA's existing authority prior to the 1990 CAA Amendments." 62 Fed.Reg. at 8320.)

ment authority (*see* sections 110(a)(2)(A), (C), and (E)); (2) call for SIP revisions to correct inadequacies (*see* section 110(k)(5)); and (3) "prescribe such regulations as are necessary to carry out [the Administrator's] functions under this chapter." 42 U.S.C. § 7601.

Response to Comments at 103. EPA's brief explains that it derived its authority for the rule from § 110(a)(2)(H)(ii), under which state plans shall "provide for revision" whenever EPA finds that the plan is "substantially inadequate to ... comply with any additional requirements established under this chapter," 42 U.S.C. § 7410(a)(2)(H)(ii), and from the statutory requirement that state plans must be "enforceable." Brief of Respondent at 41. This is hard to follow. If state plans approved by EPA met the enforceability requirement prior to EPA's adoption of the credible evidence rule, one may wonder why the state plans have now become "unenforceable" to the extent they do not permit the use of credible evidence. The pre-existing test methods, after all, are still available to determine compliance. In any event the merits of this claim are not properly before us.

▮ Regardless whether a state might be able to challenge directly the revised regulations (no state has), petitioners cannot do so. Nothing in the amended regulations requires states to change their implementation plans. That can only occur through an independent procedure known as a "SIP call." Under § 110(k)(5), the EPA must notify a state of inadequacies in its plan and request the submission of a revised plan. 42 U.S.C. § 7410(k)(5). This begins an extensive regulatory process that includes the publication of a proposed plan in the Federal Register for notice and comment before final approval by the agency. *See Greater Cincinnati Chamber of Commerce v. EPA,* 879 F.2d 1379 (6th Cir.1989) (finding that SIP calls do not constitute final agency action).

This process was set in motion before the promulgation of the rule challenged here. *See* 62 Fed.Reg. at 8327. SIP calls to various states were issued as early as 1994. EPA's notice to states included draft credible evidence language that, "if adopted by the

State and submitted to EPA for approval in the SIP, would satisfy the requirements of this SIP call." 60 Fed.Reg. 46,222, 46,225 (1995) (approving South Dakota's plan); *see also* 60 Fed.Reg. 36,361 (1995) (Kansas); 62 Fed.Reg. 17,081, 17,082 (1997) (Minnesota). When EPA published the credible evidence rule, it noted that fifteen states had submitted new plans and several had already been approved. Thus, the request that state plans be revised and the submission and approval of revised plans were not triggered by the amendments to Parts 51 and 52. In this case, petitioners have challenged neither the SIP calls nor any of the newly-approved state plans.

▮ Even if we were to assume that revising the regulations forced the states to submit new plans—something not suggested by the record—we would find petitioners' challenge unripe. It is not at all apparent that use of credible evidence alters the emissions standards governing petitioners' activities. Although the question whether EPA had statutory authority is a purely legal one, the effect of the credible evidence rule on petitioners—that is, the effect of language in state plans specifying that use of credible evidence is not precluded—is highly uncertain for reasons already mentioned. In addition, an amicus brief submitted by state air pollution authorities indicates that states have historically used credible evidence and that some state and local air agencies have relied on credible evidence as the exclusive basis for enforcement actions. *See* Brief of Amici Curiae at 4–5. Like the Supreme Court in *Toilet Goods,* 387 U.S. at 162, 87 S.Ct. 1520, we believe that our judicial appraisal "is likely to stand on a much surer footing in the context of a specific application of this regulation."

## IV

Battery Council International, as intervenor, claims that EPA has "attempted unlawfully to revise" its permit shield regulations in promulgating the credible evidence rule. Brief of Intervenor at 27.

In the 1990 Amendments, Congress established an operating permit program for cer-

tain sources of air pollution, including major stationary sources. *See* 42 U.S.C. §§ 7661–7661f. Under this program, each permit issued must include all emissions limitations and standards applicable to the source, as well as provisions concerning inspection, monitoring, compliance certification, and reporting requirements. The regulations implementing the permit program are contained in 40 C.F.R. Part 70.

Battery Council thinks the following language in EPA's preamble to the credible evidence rule "would undermine the principal purpose" of the permits:

> [although permits] can include a "permit shield" protecting [a source] from allegations that it has failed to satisfy CAA monitoring requirements, such shield does not relieve the source of its obligation to comply with the underlying emission limits or other applicable requirements being monitored.... In other words, ... the source would not be shielded from allegations of noncompliance with the underlying substantive requirements (e.g., emission limits) being monitored even if the source's required monitoring failed to detect the violation.

62 Fed.Reg. at 8320. Battery Council argues that, contrary to EPA's interpretation, "permit shields also protect sources from enforcement of 'underlying emission limits,' as long as sources comply with their permits." Brief of Intervenor at 30.

 We will not reach the merits of this argument. The credible evidence rule did not change any language in Part 70. It is doubtful that the preamble alone is definite and specific enough to be a binding statement of agency policy. For one thing, the statements concerning the permit shield were not published in the Code of Federal Regulations. *See Florida Power & Light,* 145 F.3d at 1418–19. For another, EPA has claimed that its statements were no more than "an interpretation" given "existing permit shield regulation," Brief of Respondent at 45, and Battery Council has presented no evidence that the preamble has a direct and immediate effect on it. In *Kennecott Utah Copper Corp. v. Department of the Interior,* 88 F.3d 1191, 1222 (D.C.Cir.1996), we held that although a "preamble may under some circumstances be reviewable," the preamble challenged there was nevertheless not ripe because the issue presented was conjectural and "a more complete understanding of its ramifications must await a concrete application." The same holds true here. This challenge is therefore unripe for review.

\* \* \*

Petitioners and intervenor raise a number of other subsidiary issues which, while we have considered fully, present no need for discussion. For the reasons stated above, we dismiss the petition for review.

*So ordered.*